IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 1, 2021

**IN RE MANNING H.**

**Appeal from the Chancery Court for Sumner County**
**No. 2018-AD-33      Louis W. Oliver, III, Chancellor**

_____

**No. M2020-00663-COA-R3-PT**

_____

This appeal arises from a mother and a stepfather's petition to terminate the father's parental rights to his daughter. The mother and father were married and had a son and a daughter. When they divorced, they agreed to a permanent parenting plan allowing the father equal parenting time with their son but no parenting time with their daughter. In the three and a half years preceding the filing of the petition to terminate the father's rights, the father fully exercised his parenting time with their son, but he had no contact with their daughter and did not request a modification of the permanent parenting plan. The petitioners alleged three grounds for termination of the father's parental rights to his daughter—abandonment by failure to visit and failure to support, Tenn. Code Ann. §§ 36-1-102(1)(A)(i) and -113(g)(1), and failure to manifest an ability or willingness to assume custody, Tenn. Code Ann. § 36-1-113(g)(14). The trial court determined that the petitioners proved one of the three grounds, abandonment by failure to visit; however, it found that they failed to prove by clear and convincing evidence that it was in the daughter's best interests to terminate the father's rights. Accordingly, the court denied the petition to terminate the father's parental rights to his daughter. On appeal, the petitioners contend the trial court erred in denying their petition because the evidence clearly and convincingly established that termination of the father's parental rights was in the daughter's best interests. They also contend the trial court erred in finding that they did not prove the father failed to manifest an ability or willingness to assume physical custody as codified in Tenn. Code Ann. § 36-1-113(g)(14). For his part, the father contends his failure to visit was not willful; therefore, the petitioners failed to prove any ground for termination of his parental rights. We affirm the trial court's determination that the father abandoned his daughter by failure to visit during the requisite period of time as codified in Tenn. Code Ann. § 36-1-102(1)(A)(i). We affirm its determination that the petitioners failed to prove by clear and convincing evidence all the essential elements of the ground codified in Tenn. Code Ann. § 36-1-113(g)(14). We also affirm the trial court's determination that the petitioners failed to establish by clear and convincing evidence that termination of the father's parental rights was in the daughter's best interest. Therefore, we affirm the trial court's decision to deny the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which JOHN W. MCCLARTY and ARNOLD B. GOLDIN, JJ., joined.

Jennifer D. Thomas, Gallatin, Tennessee, for the minor child, Manning H.[1]

Haley E. Medley, Gallatin, Tennessee, for the appellants, Chelsea H. and Zachary H.

Dominic J. Leonardo, Nashville, Tennessee, for the appellee, Nathan H.

**OPINION**

Chelsea H. ("Mother") and Nathan H. ("Father") were married in November 2010, and they had two children, a son, Maverick, born in 2012, and a daughter, Manning, born in 2014. The parties began having marital problems prior to Manning's birth, and in February 2014, when Mother was still pregnant with Manning, Mother petitioned the court for an order of protection against Father, alleging he pushed and shoved her. The court granted the order of protection and set overnight visitation for Father with Maverick every week from Monday at 8:00 a.m. to Wednesday at 6:00 p.m. and ordered Father to pay $317 per month in child support.

Manning was born prematurely in April 2014, after which Father promptly filed a motion with the court requesting permission to visit Manning in the hospital. The court granted Father's request in accordance with an agreed order entered in May 2014. Additionally, the court allowed Father visitation with Manning following her discharge from the hospital on Saturday mornings and Wednesday evenings at the home of Mother's parents, and Father was ordered to pay $846 per month in child support for both children. Thereafter, during the months of May through December 2014, Father regularly exercised his visitation with Maverick, but he only exercised approximately 17 days of his court-ordered visitation with Manning, and his last visit with her was on January 10, 2015.

On June 12, 2015, two weeks prior to the divorce hearing, the parties entered into a permanent parenting plan that was subsequently approved by the court. Mother was designated the primary residential parent, the parents were given joint decision-making authority, and Father was ordered to pay Mother $706 per month in child support for the two children. The parenting time with Maverick was divided equally, with Mother

---

[1] This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

receiving 183 days per year and Father receiving 182 days. The parenting time with Manning was vastly different, as Father received no parenting time with her.

Unknown to the trial court or counsel, the parties contemporaneously signed a private agreement that was prepared by Mother.[2] The private agreement noted that the court-approved child support obligation was based on the allocation of $365 for Maverick and $341 for Manning; however, it was agreed that Mother would not hold Father in contempt should he fail to pay the $341 per month in child support designated for Manning.

On June 26, 2015, and being unaware of the parties' private agreement regarding child support, the Sumner County Chancery Court entered a final divorce decree incorporating the agreed-upon permanent parenting plan that required, *inter alia*, Father to pay $706 per month in child support for the benefit of the two children and to make a payment of $100 per month to satisfy more than $5,000 in child support arrearage accrued while the divorce was pending.

Prior to and at the time of the divorce, Father enjoyed success as a singer performing at churches throughout the South and Midwest.[3] After the divorce, Father underwent a number of dental surgeries, and this hindered his ability to perform. Though Father had little to no income in the years following the divorce, with the assistance of relatives, he consistently paid Mother $465 per month in child support, which included the $365 per month for Maverick Father agreed to pay in the private agreement with an additional $100 per month to satisfy the arrearage. As agreed pursuant to the private agreement, Father did not pay the amount of child support allocated for Manning, that being $341.

Father regularly exercised his court-ordered visitation with Maverick, attended all of Maverick's baseball games, and was an active parent at Maverick's school. In stark contrast to Maverick, Father had no contact with Manning—no visits, no birthday gifts, no cards or letters, and no phone calls—nor did he request that the court modify the permanent parenting plan to allow visitation with Manning. Resultantly, Mother's then boyfriend, Zachary H., stepped into the role of father to Manning, and in the years that followed, Manning came to believe that Zachary H. was her father.

Mother and Zachary H. ("Stepfather") were married on April 7, 2018. Four months later, on August 14, 2018, they filed a petition in Sumner County Chancery Court to terminate Father's parental rights to Manning. (Hereinafter Mother and Zachary H. will be referred to, collectively, as "Petitioners.") The petition stated two grounds of abandonment—failure to visit and failure to support in accordance with §§ 36-1-102(1)(A)(i) and -113(g)(1). It also stated a third ground—failure to manifest an ability

---

[2] Father was not represented by an attorney in the divorce proceedings.

[3] Father was a contestant on the television show American Idol.

and willingness to personally assume legal and physical custody or financial responsibility of Manning, and that placing Manning in Father's legal or physical custody would cause substantial harm to her physical or psychological welfare in accordance with § 36-1-113(g)(14).

Father filed a response to the petition on October 9, 2018, denying their allegations. As for Petitioners' claim of abandonment by failure to visit, Father alleged that Mother prevented him from pursuing visitation with Manning, and he requested that the court permit him to have visitation with her.[4]

The petition was tried on November 8, 2019, and December 12, 2019, during which a number of witnesses testified, including: Mother; Father; Stepfather; Ann Marie Hudson, Manning's maternal grandmother; Brenda Sanders, Manning's paternal grandmother; and Clifton Hickman,[5] Ms. Sander's partner of over 20 years. Additionally, the court heard the testimony of Dr. David Williams McMillan, a licensed clinical psychologist, who met with Petitioners, Father, and Maverick and offered his expert opinion as to, *inter alia*, whether termination of Father's rights was in Manning's best interests.

At the conclusion of the trial, the trial court prepared and filed an order that included specific findings of fact and conclusions of law. Being that it was undisputed that Father had no contact with Manning for the three years preceding the filing of the petition and based on the court's determination that Father failed to prove that his failure to visit was not willful, the court concluded that Petitioners established the ground of abandonment by failure to visit in accordance with Tenn. Code Ann. §§ 36-1-102(1)(A)(i) and -113(g)(1). Because it was also undisputed that Father paid Mother $465 per month in child support in the four months leading up to the filing of the petition, the court found that Petitioners did not prove abandonment by failure to support. Additionally, the court found that Petitioners did not establish § 36-1-113(g)(14) as a ground for termination because Petitioners failed to present clear and convincing evidence that placing Manning in Father's legal or physical custody would cause substantial harm to her physical or psychological welfare.

Having determined that Petitioners proved one ground for termination, the court considered whether terminating Father's parental rights would be in Manning's best interest. The court found that, though Father had not developed a meaningful relationship with Manning, his home was safe, he had the ability to provide financial and emotional support, and he showed that he could be an attentive and involved parent through his relationship with Maverick. In considering the unique circumstances of this case, the court reasoned:

---

[4] The court appointed a Guardian ad Litem in an order entered on October 19, 2018.

[5] The transcript lists his name as "Clifton Hickman," but Petitioners refer to him in their brief as "Cliff Hickum."

In that [Manning] is the biological sibling of Maverick, there is no doubt that [Manning] will at some point be aware that she is the biological child of Father. The siblings Maverick and Manning will not be separated if termination does not occur, nor will any significant benefit come to the Minor Child Manning if the Birth Father's rights are terminated. Dr. McMillan expressed that many children have two mothers or two fathers and find it a benefit and not a detriment.

For these and other reasons, the court determined that Petitioners failed to prove by clear and convincing evidence that terminating Father's parental rights was in Manning's best interest.[6] Accordingly, the court denied the petition to terminate Father's parental rights to Manning.

This appeal followed.

## STANDARD OF REVIEW

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). "[T]his right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).

"To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

In an appeal, "this court is required 'to review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests.'" *In re Connor B.*, 603 S.W.3d 773, 779 (Tenn. Ct. App. 2020) (quoting *In re*

---

[6] The court also ordered "that appropriate counseling be scheduled between the Birth Father, the Petitioners, and both minor children to effectuate the introduction of [Manning] into the life of Birth Father."

*Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016)). In doing so, we must determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). Stated another way, we must make our own determination as to whether "the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97).

The trial court's findings of fact are reviewed de novo upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d at 523-24; *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed de novo with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). A trial court's determinations regarding witness credibility are entitled to great weight on appeal and will not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

**ISSUES**

Petitioners contend the trial court erred in finding that they failed to prove the essential elements of the ground codified in Tenn. Code Ann. § 36-1-113(g)(14), that being, Father's failure to manifest an ability or willingness to assume physical custody. They also contend it erred in finding that they failed to present clear and convincing evidence that termination was in Manning's best interests.[7]

---

[7] Petitioners also contend that the trial court erred in considering Dr. McMillan's expert opinion because it was based on a "wholly incorrect legal standard." Specifically, Petitioners take issue with Dr. McMillan's testimony that (1) generally, all children should know who their biological parents are, and (2) the law "seems to say" that children should know the identity of their biological parents given that the bar for terminating parental rights "is very high because of this very biological basis." Petitioners also take issue with Dr. McMillan's focus on Maverick and his relationship with Father, rather than on Manning. As we will explain in the ensuing analysis, irrespective of Dr. McMillan's testimony, the trial court applied the correct legal standard and considered the appropriate factors when determining whether grounds existed to terminate Father's parental rights and whether termination was in Manning's bests interests. We do not find Dr. McMillan's expert opinion that, generally, children should know the identity of their biological parents factored heavily into the trial court's decision. Rather, we find that the trial court properly focused on Manning, her particular circumstances, and her best interests. And, though the trial court considered testimony regarding Father's relationship with Maverick, it did so in determining whether it was safe for Manning to be in Father's care, which is a factor the court must consider in the best interest analysis. *See* Tenn. Code Ann. § 36-1-113(8). Moreover, to the extent Dr. McMillan's testimony may be inadmissible, admitting the testimony, even over Petitioners' objections, would not have affected the outcome of this case. Accordingly, it would constitute harmless error.

For his part, Father contends the trial court erred in finding that Petitioners proved the ground of abandonment by failure to visit because the proof showed that his failure to visit was not willful. Specifically, he contends his failure to visit was not willful because Mother used the threat of a statutory rape charge to prevent him from seeking parenting time with Manning.

**ANALYSIS**

The termination of parental rights is governed by statute, and parties who have standing to terminate parental rights must prove by clear and convincing evidence that (1) at least one of the statutory grounds for termination exists, and (2) that termination is in the child's best interests. *In re Audrey S.*, 182 S.W.3d at 860. Thus, we shall first determine which, if any, grounds for termination exist.

I. GROUNDS FOR TERMINATION

A. Abandonment by Failure to Visit

Tennessee Code Annotated § 36-1-113(g)(1) provides that a court may terminate the parental rights of a parent who has abandoned the child as defined by Tenn. Code Ann. § 36-1-102:

> [A]bandonment means that:
>
> For a period of four (4) consecutive months immediately preceding the filing of a . . . petition . . . to terminate the parental rights of the parent or parents . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents . . . either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child.

*Id.* § 102(1)(A)(i). A parent may assert an affirmative defense that the abandonment was not willful, but this must be shown by a preponderance of the evidence.[8] *See* Tenn. Code Ann. § 36-1-102(1)(l). Pertinent here, when one parent prevents the visitation of another, "it may result in a lack of willfulness." *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *5 (Tenn. Ct. App. Jul. 22, 2020) (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In re F.R.R. III*, 193 S.W.3d at 530).

---

[8] The statute previously required the petitioner to prove a willful failure to visit or support, but as of July 1, 2018, it was amended to delete that requirement. In their petition to terminate Father's parental rights, Petitioners cite the previous version of the statute; however, because they filed their petition in August 2018, the amended version of the statute applies.

It is undisputed that Father had no contact with Manning since January 10, 2015, more than three years preceding the filing of the petition to terminate his rights. In defense, Father testified that his failure to visit was not willful because Mother coerced him by threatening to reveal that Father had a sexual relationship with a 17-year-old girl prior to his marriage to Mother. According to Father, Mother offered him two choices: (1) agree to visitation with Maverick and no visitation with Manning or (2) go to prison for statutory rape and have no visitation with Maverick or Manning. But Father's testimony on this issue was inconsistent.

For example, Father testified that Mother did nothing to prevent him from visiting Manning from May 2014 to January 2015 in accordance with the court's May 2014 order; rather, he chose not to exercise his visitation during that time because Manning cried during his visits, and he did not want to cause her distress. Specifically, Father testified:

A. No matter what I did [Manning] seemed—I don't know—you can't tell a baby what's fear or whatever, but she would cry. When you have one baby [Maverick] and you can fix all those things and you can't fix it with this other one, then you would just want that—the only way you could fix it is to walk out the door. So even though it was horrible for me to not be with her I was going to put her emotions and her well-being ahead of mine.

Q. Okay. So your choice to discontinue visits, you're telling the court today, that you chose to do that as a kind of sacrifice for Manning. Is that fair?

A. Yes.

Furthermore, we find it significant that the agreed-upon permanent parenting plan was consistent with what Father was already doing by choice—no visitation with Manning and regular visitation with Maverick. The only differences were that the permanent parenting plan increased Father's visitation with Maverick and the parties' private agreement relieved Father of his responsibility to pay child support for Manning. We also find it significant that Father testified that he was satisfied with those particular terms. As for visitation with Manning, Father claimed it was his intent to request a modification of the plan in the near future to seek visitation with her; however, Father conceded that, in the three and a half years that followed, he never did so.

For her part, Mother testified that she did not use Father's relationship with the 17-year-old girl prior to the parties' marriage to coerce Father into accepting the terms of the permanent parenting plan, though she conceded it was an issue in the divorce. She testified that from May 2014 to January 2015, she ensured Manning was available to visit Father at the court-appointed times, but Father gave her a number of excuses for his inability to visit, and thereafter, he ceased visitation altogether. Thus, according to Mother, it was her understanding that the permanent parenting plan and their private agreement reflected

exactly what Father wanted at the time—no responsibility for or parenting time with Manning and equal responsibility for and parenting time with Maverick.

Based on the foregoing testimony and other evidence, we affirm the trial court's determination that Petitioners proved by clear and convincing evidence that Father abandoned Manning by failing to visit her during the four-month period immediately preceding the filing of the petition to terminate his parental rights.

## B. Failure to Manifest an Ability and Willingness to Assume Custody

A parent's rights may be terminated if the parent (1) "failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child;" and (2) "placing the child in the [parent]'s legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14).

### 1. Willingness or Ability

In construing this statute, the Tennessee Supreme Court recently held that the first prong requires clear and convincing proof that the parent "has failed to manifest <u>either</u> ability or willingness" to assume custody of or responsibility for the child. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (emphasis in original). Here, the trial court found that Father failed to manifest a willingness to assume physical custody of Manning, and we agree.

As previously stated, Father testified that he chose not to exercise his visitation with Manning in January 2015. Shortly following that decision, he agreed to the permanent parenting plan granting him no visitation with Manning. Additionally, Father conceded that he never requested a modification of the permanent parenting plan to allow visitation with Manning, though he was aware he could have done so.

### 2. Substantial Harm

The second prong requires clear and convincing proof that placing the child in the parent's physical custody would likely cause substantial harm. While the statute does not define "substantial harm," this court has construed it to mean "a real hazard or danger that is not minor, trivial, or insignificant." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001). And this court has explained that the harm must be "sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Id.*

The trial court determined that the testimony of Mother and other witnesses did not prove the second prong and that Father provided safe supervision and care to Maverick; thus, the court concluded that Father was capable of doing the same with Manning.

However, Petitioners argue that, regardless of Father's ability to properly care for a child, placing Manning in Father's physical custody would likely cause Manning severe psychological distress because Manning does not know him.

It is undisputed that Manning has not seen Father in more than three years and has no memory of him. Mother testified that Manning is timid around people she does not know, and if Manning were to be placed in Father's home, "[s]he would be very confused and just so devastated . . . It would absolutely destroy her." Likewise, Father conceded in his testimony that placing Manning in his physical custody "would be terrible. Because she would say who are you?"

The foregoing testimony is consistent with prior rulings by this court wherein we concluded that "forcing a child to begin visitation with a near-stranger would make psychological harm sufficiently probable." *In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021); *see In Braelyn S.*, 2020 WL 4200088, at *17 (Reintroducing the father to the child after more than five years apart would likely cause substantial harm.); *see also In re Brayla T.*, No. M2019-02265-COA-R3-PT, 2020 WL 5524618, at *10 (Tenn. Ct. App. Sept. 14, 2020) (Placing the child in the father's physical custody would likely cause substantial harm because the child had not seen the father in nearly four years.).

However, as we discuss in more detail in our best interest analysis below, Dr. McMillan testified that, despite Father's failings, he is "acutely attentive to his son" and has exhibited good parenting skills where his son is concerned. Moreover, Mother testified that Father was a good parent to Maverick, and Maverick was safe in his care. Further, and significantly, Dr. McMillan stated that, although introducing Father to Manning would be disruptive in the short term and would likely cause Manning psychological distress, it would benefit her in the long term because, like her brother, she would have two fathers in her life to love and support her.

The specific issue at hand is whether Petitioners proved by clear and convincing evidence that placing Manning in Father's physical custody would likely cause "substantial harm." As previously stated, "substantial harm" means "a real hazard or danger that is not minor, trivial, or insignificant." *See Ray*, 83 S.W.3d at 732. Moreover, the harm must be "sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Id.* As noted earlier, "[c]lear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596. Having considered the relevant and material evidence pertinent to this issue, and recognizing that the court ordered that the reunification of Father and Manning be a slow process with supervision by psychological counselors, we find the evidence fails to eliminate any serious or substantial doubt that substantial harm would likely occur. Accordingly, the evidence fails to satisfy the clear and convincing standard.

Thus, we affirm the trial court's determination that Petitioners did not establish all of the essential elements of the ground codified in Tenn. Code Ann. § 36-1-113(g)(14).

## II. BEST INTERESTS

Having found that Petitioners established a ground for the termination of Father's rights, we next consider whether termination is in Manning's best interests. *In re Bernard T.*, 319 S.W.3d at 606; Tenn. Code Ann. § 36-1-113(c).

Tennessee Code Annotated § 36-1-113(i) lists nine factors that are to be considered in the analysis;[9] however, these "factors are illustrative, not exclusive," and the parties are free to offer proof of any other relevant factor to the analysis. *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). The trial court set forth detailed findings of fact regarding each of the nine factors in Tenn. Code Ann. § 36-1-113(i), and we review its findings below.

> (1) Whether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian[.]" *Id*. § 113(i)(1).

The trial court found there was no proof that Father's home was unsafe and no proof that he could not care for Manning. In pertinent part, the court noted that if the home was unsafe, Mother would not allow Maverick to continue his parenting time with Father on an every-other-week basis. It further found that even though Father has not had parenting time with Manning for an extended period, based on the testimony of Dr. McMillan, Father was capable of being an effective parent for Manning. Thus, the court found this factor favored Father, and the evidence does not preponderate against this finding.

> (2) Whether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible[.] *Id*. § 113(i)(2).

The trial court found that no social service agency had been involved. Moreover, it noted there was no evidence that a lasting adjustment could not occur. Based on these findings, the court determined that this factor was neutral, and the evidence does not preponderate against the court's findings.

---

[9] Tenn. Code Ann. § 36-1-113(i) has been amended and the best interest factors to be considered have been revised. *See* Act of April 22, 2021, ch. 190, § 1, 2021 Tenn. Pub. Acts ---- (to be codified as amended at Tenn. Code Ann. § 36-1-113(i)).

(3) Whether the parent . . . has maintained regular visitation or other contact with the child[.] *Id.* § 113(i)(3).

The trial court found that Father had not visited Manning since January 2015, when she was eight months old. The court went on to find that the parents entered into a "quid pro quo side agreement in which [Father] bargained away his parenting time with [Manning] in exchange for equal parenting time with [Maverick]." Based on these findings, the court determined that this factor favored termination, and the evidence does not preponderate against the court's findings.

(4) Whether a meaningful relationship has otherwise been established between the parent . . . and the child[.] *Id.* § 113(i)(4).

The court found that a meaningful relationship had not been established, and this fact is undisputed. Although the court did not state whether this factor favored termination, it is implicit in its ruling that it does, and the evidence does not preponderate against this finding.

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition[.] *Id.* § 113(i)(5).

The trial court made the following findings regarding this factor:

If Birth Father's parental rights are not terminated, and Birth Father maintains his legal rights as a parent, this would not affect the caretaker of [Manning] in that Mother is designated primary residential parent. Further, Dr. McMillan testified that the introduction of Birth Father into the life of [Manning] should be slow, and at a pace the child can emotionally accept. Dr. McMillan further testified it would be wrong to put [Manning] in the same arrangement as Maverick with equal time with each parent. At (5) years old the child will adapt to a relationship with Birth Father, with Mother remaining the primary parent. If termination is to occur, [Manning] will ask "what's wrong with me?" knowing that Maverick has both fathers, while she is limited to one.

Based on these findings, the trial court concluded that "[i]t is in [Manning's] best interest to have both fathers, along with Maverick," and the evidence does not preponderate against these findings.

(6) Whether the parent . . . , or other person residing with the parent . . . , has shown brutality, physical, sexual, emotional or psychological abuse, or

- 12 -

neglect toward the child, or another child or adult in the family or household[.] *Id*. § 113(i)(6).

The court made numerous findings regarding this factor—the most compelling finding being that Mother admitted that Father was "a good father," although she had "some concerns." She then admitted that he "attends all the activities of Maverick." The court went on to find that "[t]he most telling proof that Mother does not consider [Father] abusive nor neglectful is that she has not challenged [Father's] equal parenting time with Maverick since the parties entered into the Permanent Parenting Plan in June 2015." The court further found that there has been no showing that any other person resides with Father other than Maverick. Although the court did not state whether this factor favored Father or termination, it is implicit in its ruling that it favors Father and does not favor termination, and the evidence does not preponderate against this finding.

> (7) Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner[.] *Id*. § 113(i)(7).

The trial court found that Father resides in a well-furnished and clean two-bedroom apartment in Gallatin. It noted there was no proof of criminal activity, use of alcohol or controlled substances, or other proof that Father will be unable to care for Manning in a safe and stable manner. Again, although the court did not state whether this factor favored termination, it is implicit in its ruling that it favors Father, and the evidence does not preponderate against this finding.

> (8) Whether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child[.] *Id*. § 113(i)(8).

When considering this factor, the court stated:

> [T]he Birth Father's mental and emotional status is not detrimental to [Manning], nor does his mental or emotional status prevent him from effectively providing safe and stable supervision and care for [Manning]. Dr. McMillan expressed the opinion that [Manning] will develop a stable relationship with Birth Father.

Specifically, Dr. McMillan testified that Father has exhibited good parenting skills where Maverick is concerned; thus, Father has shown that he is capable of properly caring for Manning. As for Mother, she also testified that Father was a good parent to Maverick,

- 13 -

and Maverick was safe in his care. Therefore, the evidence supports the court's finding that this factor favors Father.

> (9) Whether the parent . . . has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101. *Id*. § 113(i)(9).

After noting that Father was ordered to pay child support for the benefit of both children in the amount of $706 per month, the court noted that the parties entered into a private agreement reducing Father's child support obligation and that Father did not pay the portion of child support allocated for Manning in the private agreement. Based on these and other findings, the court concluded that Father had not paid child support consistent with the child support guidelines; however, Father did pay child support in accordance with the private agreement. It went on to find that "a portion of the child support paid by [Father] no doubt benefitted [Manning]." As with other factors, the court did not state whether this factor favored Father or termination. Nevertheless, the question is "whether the parent . . . has paid child support consistent with the child support guidelines," and it is undisputed that Father did not. Accordingly, this factor favors termination, and the evidence does not preponderate against this finding.

After considering the nine statutory factors, the trial court determined that it was not in Manning's best interest to terminate Father's parental rights:

> The Court finds that it is <u>not</u> in the best interest of [Manning] to terminate Birth Father's parental rights. In that [Manning] is the biological sibling of Maverick, there is no doubt that [Manning] will at some point be aware that she is the biological child of the Birth Father. The siblings Maverick and Manning will not be separated if termination does not occur, nor will any significant benefit come to the Minor Child Manning if the Birth Father's parental rights are terminated. Dr. McMillan expressed that many children have two mothers or two fathers and find it a benefit and not a detriment….

> The Court further Orders that appropriate counseling be scheduled between Birth Father, the Petitioners, and both minor children to effectuate the introduction of [Manning] into the life of Birth Father. There is to be no communication to [Manning] by anyone regarding the status of this matter and there is to be no visitation or parenting time established for Birth Father with [Manning] without appropriate professional guidance and Court approval.

As determined by the trial court, some of the factors indicate it is not in Manning's best interest for Father's parental rights to be terminated and others indicate it is; however, the best interest analysis does not consist of a rote examination of each factor followed by

"a determination of whether the sum of the factors tips in favor of or against the parent." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Instead, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* Moreover, "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence," but "the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535. And significantly, the focus is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005).

Father has not visited Manning in more than three years and has no relationship with her, and though he offers a number of excuses for failing to seek visitation with her, from Manning's perspective, "the reasons for the lack of interaction matter little." *See White*, 171 S.W.3d at 194. It is clear from the testimony that Manning is happy and thriving in Petitioners' care, and for that reason, Petitioners argue that it is in Manning's best interests to maintain the status quo. But, as we will explain, the evidence suggests that maintaining the status quo will likely have a negative effect on Manning in the long term.

It is undisputed that Father has regular visitation with Manning's brother, Maverick, is active at Maverick's school, and attends Maverick's baseball games and other extracurricular activities. And Mother testified that Manning and her brother attend the same elementary school, and they have a close relationship with each other. Additionally, Mother and Father acknowledged that Manning has a relationship with her paternal grandfather and knows that he is her grandfather, but, because of her young age, she has yet to deduce that Father is her biological father. Under those circumstances, Dr. McMillan testified that Manning will inevitably discover that Father is her biological parent. And he further testified that, when this occurs, continuing business as usual—allowing Father regular visitation with Maverick but prohibiting any contact with Manning—will likely be very detrimental to Manning's emotional well-being. And significantly, Dr. McMillan opined that, though introducing Father to Manning would be disruptive in the short term, it would benefit her in the long term because, like her brother, she would have two fathers in her life to love and support her.

Father admits that he made a mistake in failing to seek visitation with Manning and asks for a chance to rectify it. "Not all parental misconduct is irredeemable." *In re Audrey S.*, 182 S.W.3d at 877. For that very reason, our statutes "recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *Id.*

Having considered the evidence related to the relevant factors, and considering the unique facts of this case, *see White*, 171 S.W.3d at 194, we have concluded that the evidence is insufficient to eliminate any serious or substantial doubt as to whether termination of Father's parental rights is in Manning's best interest. *See In re Bernard T.*, 319 S.W.3d at 596. Therefore, we affirm the trial court's decision to deny the petition to terminate his parental rights.

**IN CONCLUSION**

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Chelsea and Zachary H.

_____
FRANK G. CLEMENT JR., P.J., M.S.